Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Charles Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Pavithra Rajesh (SBN 323055)
  *prajesh@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff Justin Kojak*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN KOJAK, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CANOO INC. f/k/a HENNESSY CAPITAL ACQUISITION CORP. IV, ULRICH KRANZ, TONY AQUILA, DANIEL J. HENNESSY, NICHOLAS A. PETRUSKA, BRADLEY BELL, PETER SHEA, RICHARD BURNS, JAMES F. O'NEIL III, JUAN CARLOS MAS, GRETCHEN W. MCCLAIN, and GREG ETHRIDGE, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Justin Kojak ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Canoo Inc. ("Canoo" or the "Company") f/k/a Hennessy Capital Acquisition Corp. IV ("Hennessy Capital") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Canoo; and (c) review of other publicly available information concerning Canoo.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Canoo securities between August 18, 2020 and March 29, 2021, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Canoo Holdings Ltd. ("Canoo Holdings") was an electric vehicle company that touted a "unique business model that defies traditional ownership to put customers first." It has announced a delivery vehicle (to launch in 2022), pickup truck (to launch in 2023), and van, all of which are built on the same underlying technological platform.

3. Hennessy Capital was a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination. On or about December 21, 2020, Canoo Holdings became a public entity via merger with Hennessy Capital, with the surviving entity named "Canoo."

4. On March 29, 2021, after the market closed, Canoo revealed that the Company would no longer focus on its engineering services line, which had been

touted in the SPAC merger documents just three months earlier and formed the basis of Canoo's growth story.

5.      On this news, the Company's stock price fell $2.50, or 21.19%, to close at $9.30 per share on March 30, 2021, on unusually heavy trading volume.

6.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Canoo had decreased its focus on its plan to sell vehicles to consumers through a subscription model; (2) that Canoo would de-emphasize its engineering services business; (3) that, contrary to prior statements, Canoo did not have partnerships with original equipment manufacturers and no longer engaged in the previously announced partnership with Hyundai; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this

Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

11.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.    Plaintiff Justin Kojak, as set forth in the accompanying certification, incorporated by reference herein, purchased Canoo securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.    Defendant Canoo is incorporated under the laws of Delaware with its principal executive offices located in Torrance, California. Canoo's common stock trades on the NASDAQ exchange under the symbol "GOEV," and its warrants trade under the symbol "GOEVW." Hennessy Capital was incorporated under the laws of Delaware with its principal executive offices located in Wilson, Wyoming. Prior to the Merger, Hennessy Capital's Class A common stock traded on the NASDAQ exchange under the symbol "HCAC," its redeemable units under the symbol "HCACW," and its units (each consisting of one share of Class A common stock and three-quarters of one redeemable warrant) under the symbol "HCACU."

14.    Defendant Ulrich Kranz ("Kranz") was the Chief Executive Officer ("CEO") of Canoo at all relevant times. Kranz cofounded Canoo Holdings.

15.    Defendant Tony Aquila ("Aquila") has been a director of the Company since the closing of the Merger and was named an incoming director in the Merger documents. He served as a Executive Chairman of Hennessy Capital from October 20, 2020 to the closing of the Merger.

16.     Defendant Daniel J. Hennessy ("Hennessy") was the Chairman of Hennessy Capital's Board of Directors and CEO of Hennessy Capital at the time of the Merger.

17.     Defendant Nicholas A. Petruska ("Petruska") was the Executive Vice President and CFO of Hennessy Capital at the time of the Merger.

18.     Defendant Bradley Bell ("Bell") was a director of Hennessy Capital at the time of the Merger.

19.     Defendant Peter Shea ("Shea") was a director of Hennessy Capital at the time of the Merger.

20.     Defendant Richard Burns ("Burns") was a director of Hennessy Capital at the time of the Merger.

21.     Defendant James F. O'Neil III ("O'Neil") was a director of Hennessy Capital at the time of the Merger.

22.     Defendant Juan Carlos Mas ("Mas") was a director of Hennessy Capital at the time of the Merger.

23.     Defendant Gretchen W. McClain ("McClain") was a director of Hennessy Capital at the time of the Merger.

24.     Defendant Greg Ethridge ("Ethridge") was a director of Hennessy Capital at the time of the Merger.

25.     Defendants Kranz, Aquila, Hennessy, Petruska, Bell, Shea, Burns, O'Neil, Mas, McClain, and Ethridge (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to

material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Canoo Holdings was an electric vehicle company that touted a "unique business model that defies traditional ownership to put customers first." It has announced a delivery vehicle (to launch in 2022), pickup truck (to launch in 2023), and van, all of which are built on the same underlying technological platform.

27.     Hennessy Capital was a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination. On or about December 21, 2020, Canoo Holdings became a public entity via merger with Hennessy Capital, with the surviving entity named "Canoo."

### Materially False and Misleading
### Statements Issued During the Class Period

28.     The Class Period begins on August 18, 2020. On that day, Hennessy Capital and Canoo Holdings issued a joint press release announcing the Merger. The press release stated, in relevant part:[1]

> Canoo Co-Founder and Chief Executive Officer, Ulrich Kranz said, "Today marks an important milestone of Canoo's effort to reinvent the development, production and go-to-market model of the electric vehicle industry. Our technology allows for rapid and cost-effective vehicle development through the world's flattest skateboard architecture, and we believe our subscription model will transform the consumer ownership experience. We are excited to partner with Hennessy Capital and we are energized to begin our journey through a shared passion to

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

deliver an environmentally friendly and versatile vehicle development platform to the market."

Daniel Hennessy, Chairman & Chief Executive Officer of HCAC said, "We are thrilled to partner with Canoo on their mission to reinvent urban mobility with a greener, simpler and more affordable portfolio of EV solutions. *Unlike any other EV company, Canoo has created a go-to-market strategy that captures both B2C and B2B demand with the same skateboard architecture and technology that has already been validated by key partnerships such as with Hyundai.* HCAC has an abiding commitment to sustainable technologies and infrastructure, and we are excited to serve as a catalyst to advance the launch of the Canoo vehicle offerings."

\*     \*     \*

*Canoo's consumer go-to-market strategy capitalizes on changing consumer preferences to deliver a month-to-month, commitment-free, subscription-based business model.* With a single monthly fee and no upfront payment, Canoo members enjoy the benefits of an all-inclusive experience that, in addition to your own canoo vehicle, includes maintenance, warranty, registration and access to insurance and vehicle charging. *This go-to-market model is designed to deliver an affordable and simplified customer experience while also enhancing lifetime vehicle revenue and margin to shareholders.*

29.     On September 18, 2020, the Company filed its Registration Statement on Form S-1 with the SEC. The Registration Statement was subsequently amended on October 23, 2020 and November 27, 2020, making substantially the same statements as identified herein. The Company also filed its Prospectus on Form 424b3 with the SEC on December 4, 2020, making substantially the same statements. The Registration Statement was signed by defendants Hennessy, Petruska, Bell, Shea, Burns, O'Neil, Mas, McClain, and Ethridge. It touted Canoo's engineering services, stating:

**ENGINEERING AND TECHNOLOGY SERVICES**

Canoo's engineering and technology services business covers all the material consulting and contract engineering work that is in high demand due to our team's specialized experience and technical capabilities in EV development. *This business offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021.* We expect our engineering and technology services business to offer significant growth potential in the future as projected demand grows for EVs and their related technologies, namely in platform/skateboard development, powertrain, battery technologies and power electronics, among other

areas, in which we have substantial expertise. ***In addition to providing external commercial validation of Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business model.***

Canoo's pipeline for engineering services includes EV concept design and engineering services for other OEMs, autonomous driving strategics and high growth technology companies. There is a significant market for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs. Canoo is at a distinct competitive advantage to capitalize on this growing demand. In fact, whereas other new EV entrants are forced to license key technologies and/or outsource primary engineering development to larger OEMs, ***Canoo has already received significant OEM interest in our skateboard technology and our team's expertise in platform engineering, powertrains and vehicle design, as is exemplified by the announcement of an agreement between Hyundai Motor Group and Canoo for the co-development of a future EV platform based on Canoo's modular skateboard technology.***

Contract engineering opportunities serve as concrete points of external validation for our technology and the talent of our team, as well as provide additional sources of revenue and long-term commercial opportunities (such as skateboard and technology licensing) as the relationship matures. ***Canoo is also in discussions with a number of other partners and expects to be in a position to announce many more partnerships in due course.***

30.     The Registration Statement also touted Canoo's engineering services as a "Competitive Strength[]," stating:

**Contract Engineering services offer a separate revenue stream and validate the quality of our technology**

There exists significant market potential for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs. Canoo is at a distinct competitive advantage to capitalize on this growing demand by leveraging the extensive knowledge and experience of its world class team. In fact, whereas other new EV entrants are forced to license key technologies or outsource primary engineering development to larger OEMs, Canoo has already received significant OEM interest in our skateboard technology and our team's expertise in platform engineering, powertrains and vehicle design.

31.     Similarly, the Registration Statement stated that Hennessy Capital's Board considered Canoo's engineering services and subscription model to be "positive factors" supporting the Merger, stating:

In considering the Business Combination, the HCAC Board concluded that Canoo substantially met the above criteria. In particular, the HCAC Board considered the following positive factors, although not weighted or presented in any order of significance:

\*       \*       \*

- *B2B Engineering and Licensing Opportunities*:   Canoo's engineering and technology services business includes consulting and contract engineering work that is in high demand due to the team's unique experience and technical capabilities. Canoo's pipeline for engineering services includes EV concept design and engineering services for other OEMs, autonomous driving strategies and high growth technology companies. Canoo has already received significant interest in its skateboard technology and the Canoo team's expertise in platform engineering, powertrains and vehicle design, *as is exemplified by the announcement of an agreement between Canoo and Hyundai Motor Group for the co-development of a future EV platform based on Canoo's modular skateboard technology. In addition to providing external commercial validation of Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk the overall business model.*

- *Compelling Financial Model with Long-Term Attractive Margin and Cash Flow Generation Potential.*   Canoo's subscription-based consumer model deviates from the traditional OEM model of vehicle sales or traditional leases, and can achieve attractive returns by elongating the revenue generation horizon of a single vehicle over the long life of the asset. Under a consumer subscription model, Canoo generates consistent cash flows, an estimated margin of approximately four times that of a one-time sale, and compelling return on equity given the leverageability of the underlying individual vehicle assets (with an estimated advance rate on vehicle bill of materials and production cost in excess of 80% over time and attractive financing terms through the over half a trillion dollar market for automotive financing and securitization). Further, Canoo is much less dependent on new vehicle sales creating a considerably more profitable and resilient business model which is expected to create steady and recurring cash flow. Revenues from traditional sales models of the last-mile delivery vehicles and contract engineering and licensing opportunities also are anticipated by Canoo management to have attractive margins.

32.     On December 21, 2020, stockholders voted at a special meeting to approve the Merger based on the Registration Statement, as amended, and Prospectus.

33.     On January 13, 2021, Canoo filed a registration statement on Form S-1 for the issuance of common stock upon the exercise of certain warrants. Therein, the Company touted its engineering services line and the Hyundai partnership, stating:

**ENGINEERING AND TECHNOLOGY SERVICES**

Our engineering and technology services business covers all the material consulting and contract engineering work that is in high demand due to our team's specialized experience and technical capabilities in EV development. This business offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021. We expect our engineering and technology services business to offer significant growth potential in the future as projected demand grows for EVs and their related technologies, namely in platform/skateboard development, powertrain, battery technologies and power electronics, among other areas, in which we have substantial expertise. In addition to providing external commercial validation of our technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business model.

Our pipeline for engineering services includes EV concept design and engineering services for other OEMs, autonomous driving strategies and high growth technology companies. There is a significant market for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs. We are at a distinct competitive advantage to capitalize on this growing demand. In fact, whereas other new EV entrants are forced to license key technologies and/or outsource primary engineering development to larger OEMs, ***we have already received significant OEM interest in our skateboard technology and our team's expertise in platform engineering, powertrains and vehicle design, as is exemplified by the announcement of an agreement between us and Hyundai Motor Group for the co-development of a future EV platform based on our modular skateboard technology.***

Contract engineering opportunities serve as concrete points of external validation for our technology and the talent of our team, as well as provide additional sources of revenue and long-term commercial opportunities (such as skateboard and technology licensing) as the relationship matures. ***We are also in discussions with a number of other partners and expect to be in a position to announce many more partnerships in due course.***

34.     Regarding Canoo's subscription model, the Form S-1 stated, in relevant part:

**Subscription Offerings**

Both our Lifestyle Vehicle and our Sport Vehicle are initially intended to be made available to consumers via an innovative subscription business model. Research from Volvo and the Harris Poll shows that 74% of drivers believe EVs are the future of driving, but many are concerned about trying a new technology. 40% of non-EV drivers responded that a 30 day "try before you buy" period would increase the likelihood of them purchasing an EV. In other words, consumers are increasingly interested in EV technology, but long-term commitments (or other hurdles like sizable down payments) remain a significant barrier to entry. ***By reducing the commitment required for a typical car purchase or lease, we believe the subscription model will help reduce the barriers to entry for consumers looking to drive an EV, while also providing us with a distinct opportunity for recurring revenue and a unique profit margin profile. We believe this model is supported by a number of key trends in consumer preferences and strong underlying financial metrics as compared to a traditional one-time sale model.***

35.     On January 25, 2021, Canoo filed its prospectus on Form 424b3 for the issuance of common stock upon the exercise of certain warrants, making substantially the same statements identified in ¶¶ 33-34.

36.     The above statements identified in ¶¶ 28-31, 33-35 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that Canoo had decreased its focus on its plan to sell vehicles to consumers through a subscription model; (2) that Canoo would de-emphasize its engineering services business; (3) that, contrary to prior statements, Canoo did not have partnerships with original equipment manufacturers and no longer engaged in the previously announced partnership with Hyundai; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

37.     On March 29, 2021, after the market closed, Canoo held a conference call in connection with its fourth quarter 2020 financial results which were released the same day. During the call, defendant Aquila revealed that the Company would no longer focus on its engineering services line, stating:

Due to the expansion of our derivatives and the best return on capital, it was decided by our Board to de-emphasize the originally stated contract engineering services line, and this will further accelerate the creation of IP and the launch of our derivatives which enhance our opportunity for the highest return on capital. Once this is complete, this will allow us to commercialize the three vehicles we have announced, our pickup truck, our multi-purpose delivery vehicle or MPDV1, and our lifestyle vehicle, all of which sit on our multi-purpose platform, which we call MPP1.

38.     The same day, the Company also announced that Paul Balciunas, who served as the Chief Financial Officer of Canoo following the close of the Merger, had resigned, effective April 2, 2021.

39.     Analysts were quick to point out that this contradicted the strategy touted in the SPAC merger. Analyst Craig Irwin from Roth Capital Partners stated, "So I would acknowledge that these are significant surprises on the call today, and that's not ideal after a SPAC – the IPO process. So I just wanted to underline that." He also asked: "[Y]ou talked about how engineering IP broadens your TAM [i.e., total addressable market], but then you announced that you're de-emphasizing your engineering services. Can you help us resolve that and maybe give us a little bit more color about *why you would deemphasize engineering given that the original story was it would subsidize the development and broaden the partner opportunity with potentially multiple hats under license?*" Defendant Aquila replied:

*I would say that from a Company perspective, it was a contradiction.* It hasn't been a contradiction from my statement. Look, as I overly -- as I said in the remarks, we look into this and it kind of goes us to your first question too with the talent war and everything. Just $25 million, it would yield us, we at the Board really feel like the best thing to do is to accelerate our derivatives and focus our talent on creating IP for the Company.

You also have a lot of IP leakage when you do this work. And from my perspective, if I had been more involved earlier and certainly once I start, I invested and then took the Chairmanship, we started the analysis. I had concerns about this. If you study, (inaudible) you know, if you can find a partnership or something like that, it can make sense. And we'll continue to look for things, but *to be a contract engineering house is just really not going to drive the best shareholder value.*

40.     In another exchange, defendant Aquila conceded that management had been "aggressive" in their prior statements:

**Steve Sakanos, Cronos Capital**: [D]uring the course of the year, you stated a couple of times that you had under discussion with some OEMs and possibly the contract manufacturer. You said that there are going to be some announcements by the end of Q4. I'm just wondering what happened that changed all of that?

**Defendant Aquila**: Right. So you're again owning the past as much as the present in the future. Look, I can only speak to what I know about this. *I think that they were focused on maybe a little more aggressive than I would be in their statements. I think more maturity of this team would not be that presumptuous.* We only announced what is contracted. But year, I think *they had the opportunities but they weren't at our standard of representation to the public markets*. . . .

And then with respect to contract manufacturing, again we wouldn't make an announcement. *Again, this comes back to having an experienced public company here to be careful of the statements you make. So again, I think it was a little premature.*

41.    Analysts also sought to determine what caused the change in strategy. Analyst John Murphy from Bank of America asked: "I mean, you tweak[ed] the business model a little bit. . . . Is there just too much opportunity on the commercial side, and you're kind of putting that sort of back burner, or [is] the subscription model still in play?" Defendant Aquila explained that this was a better use of capital, i.e. there had not been a change in industry dynamics:

So great question, John. So look, you know the industry well. If you think about a membership model, when I came in and took my role and we spent a lot of money analyzing the weight that this will have on the balance sheet. And I think to the point that Craig was talking about the changes, I mean, we wanted to bring in people who have a lot of experience on residual value, balance sheet management, and how to build a company at scale. And so you can only have a certain percentage of your business on membership. Otherwise, you've got a big cash hit that starts to develop on you as you can probably imagine. So we'll be doing that on an appropriate basis.

*Had I've been here from day one, I can tell you I wouldn't change anything on that MPP is its amazing design, which is why I compliment the engineering team incredible.* What I have changed the sequence of tour pass [ph] and use cases I would go after based on my experience without a doubt, as you can see the modifications we're doing.

*And to your point, when you really think about it on a financial burden basis on the balance sheet, yeah, there's probably 80% change, but it's too the mathematical positive.* As far as the sequence of changing the things, we really on the top hat side, which is less right here in the 20% to 40% range.

So I like the model. I believe in the model. I know the model. It holds up mathematically and we'll walk you through this. ***And again I apologize to anybody. As a leader, you always own the past before the present or the future.*** And so I take everyone's comments in all three categories.

42.     Another analyst clarified whether the shift in strategy meant that the "original SPAC model is no longer guidance going forward." Defendant Aquila seemingly confirmed the analyst's suspicion, stating:

[A]t this point, it doesn't make sense to give guidance until we complete the work that we have started. And with all that's going on in the SPAC world, in the pre-revenue side, we want to be very conservative. . . . Certainly, I do acknowledge your point, Craig, that you got so to speak as you mentioned, showed a different model. But this model is better from a return on capital perspective.

43.     Defendant Aquila also seemed to acknowledge that the Company no longer had a partnership with Hyundai, as he did not correct an analyst who stated, "the Hyundai arrangement, the original one, which I am assuming that's now off the table." Joseph Spak from RBC Capital Markets went on to ask: "You mentioned IP leakage as one of the potential problems with that arrangement. Can you just talk about like how do you unwind that sort of I guess memorandum of understanding? What work was done? Do you think there was any IP-related, [ph] obviously, Hyundai coming out with their own electric vehicle platforms as well?" Defendant Aquila responded:

I think what happened is pretty kind of case in point, right. So I think the Company just like any adolescent company is it's learning, its way and all of us go through it. But it factored in contract manufacturing based on the labor of engineers, not based on the value of IP, which would change the value of that contract significantly. And look we have experience in this area and we're very focused on, if we do work, one we can protect our IP and we can get the residual value of that in addition to.

So it's kind of caused us to say, hey, let's put that on hold, we have so much demand for our three derivatives, let's get all that work done, and then let's look at if there partnerships. Partnerships can work in this industry but contract manufacturing work is, as you know, is not the best business line to be in. And so was there some leakage? Well, I'll leave it to you to make that decision. But obviously, I'm not a big fan of doing that type of business.

44.     On this news, the Company's stock price fell $2.50, or 21.19%, to close at $9.30 per share on March 30, 2021, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Canoo securities between August 18, 2020 and March 29, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

46.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Canoo's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Canoo shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Canoo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Canoo; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

51.     The market for Canoo's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Canoo's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Canoo's securities relying upon the integrity of the market price of the Company's securities and market information relating to Canoo, and have been damaged thereby.

52.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Canoo's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The

statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Canoo's business, operations, and prospects as alleged herein.

53.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Canoo's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

54.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

55.    During the Class Period, Plaintiff and the Class purchased Canoo's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

56.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements

or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Canoo, their control over, and/or receipt and/or modification of Canoo's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Canoo, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

57.    The market for Canoo's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Canoo's securities traded at artificially inflated prices during the Class Period.  On December 10, 2020, the Company's share price closed at a Class Period high of $22.00 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Canoo's securities and market information relating to Canoo, and have been damaged thereby.

58.    During the Class Period, the artificial inflation of Canoo's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Canoo's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Canoo and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of

1   the Company shares.  Defendants' materially false and/or misleading statements
2   during the Class Period resulted in Plaintiff and other members of the Class
3   purchasing the Company's securities at such artificially inflated prices, and each of
4   them has been damaged as a result.

5       59.    At all relevant times, the market for Canoo's securities was an efficient
6   market for the following reasons, among others:

7           (a)    Canoo shares met the requirements for listing, and was listed and
8   actively traded on the NASDAQ, a highly efficient and automated market;

9           (b)    As a regulated issuer, Canoo filed periodic public reports with
10  the SEC and/or the NASDAQ;

11          (c)    Canoo regularly communicated with public investors via
12  established market communication mechanisms, including through regular
13  dissemination of press releases on the national circuits of major newswire services
14  and through other wide-ranging public disclosures, such as communications with the
15  financial press and other similar reporting services; and/or

16          (d)    Canoo was followed by securities analysts employed by
17  brokerage firms who wrote reports about the Company, and these reports were
18  distributed to the sales force and certain customers of their respective brokerage
19  firms.   Each of these reports was publicly available and entered the public
20  marketplace.

21      60.    As a result of the foregoing, the market for Canoo's securities promptly
22  digested current information regarding Canoo from all publicly available sources
23  and reflected such information in Canoo's share price. Under these circumstances,
24  all purchasers of Canoo's securities during the Class Period suffered similar injury
25  through their purchase of Canoo's securities at artificially inflated prices and a
26  presumption of reliance applies.

27      61.    A Class-wide presumption of reliance is also appropriate in this action
28  under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United*

*States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

62.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Canoo who knew that the statement was false when made.

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

63.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Canoo's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

65.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Canoo's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

66.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Canoo's financial well-being and prospects, as specified herein.

67.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of

Canoo's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Canoo and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

68.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

69.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Canoo's financial well-being and prospects from the investing public and

supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

70.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Canoo's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Canoo's securities during the Class Period at artificially high prices and were damaged thereby.

71.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Canoo was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Canoo securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

72.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

74.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

75.   Individual Defendants acted as controlling persons of Canoo within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76.   In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

77.   As set forth above, Canoo and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  April 2, 2021

**GLANCY PRONGAY & MURRAY LLP**

By:   */s/ Charles H. Linehan*

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  info@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**

Frank R. Cruz (SBN 216587)
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Justin Kojak*

**SWORN CERTIFICATION OF PLAINTIFF**

**CANOO INC. SECURITIES LITIGATION**

I, Justin Kojak, certify that:

1.  I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase the Canoo Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Canoo Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

3/31/2021
_____
Date

DocuSigned by:
_____
89726221EE8540C...

Justin Kojak

**Justin Kojak's Transactions in Canoo Inc. (GOEV) Common Stock**

**Account 1**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 1/13/2021 | Bought | 100 | $19.99 |

**Account 2**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 1/13/2021 | Bought | 30 | $19.99 |

**Justin Kojak's Transactions in Canoo Inc. (GOEVW) Warrants**

**Account 1**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 1/13/2021 | Bought | 100 | $6.24 |